UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
RLI INSURANCE COMPANY and ALEA NORTH
AMERICAN INSURANCE COMPANY a/s/o 430      Case No. 05-CV-09961
OWNERS CORP.,                             (LAK)(FM)

                      **Plaintiffs,**

                -against-                        AFFIDAVIT OF
                                                       MICHAEL ZACHARIAS

KING SHA GROUP, INC., CERTIFIED TESTING
LABORATORIES, INC., GOLDEN VALE
CONSTRUCTION CORP. and S.T.A. PARKING
CORP.,

                      **Defendants.**
------------------------------------------------------------------------ x

STATE OF NEW YORK    )
                             ) ss.:
COUNTY OF NEW YORK  )

        MICHAEL ZACHARIAS, being duly sworn, deposes and says the following:

        1.       I am the president and sole shareholder of defendant S.T.A. Parking Corp. ("STA"). As such, I have personal knowledge of and am fully familiar with the facts and circumstances hereinafter set forth.

        2.       I submit this affidavit in support of STA's inquest for the determination of damages to be awarded against defendant Golden Vale Construction Corp. ("Golden Vale").

        3.       On March 2, 2007, Hon. Lewis Kaplan issued a default judgment on liability against Golden Vale and in favor of STA on STA's cross-claim for negligence (exhibit "C"). Now the only remaining issue before the Court is a determination of STA's damages. As set forth in further detail below, STA's claim arises out of Golden Vale's installation of defective underpinning and subsequent abandonment of a construction project owned by STA. STA's damage claim is $1,736,468.00 and is comprised of three components – (i) $326,089.00 in

contract cost overruns, (ii) $1,156,604.00 in lost revenue resulting from extensive project delays and (iii) prejudgment interest in the amount of $253,775.00.

**STATEMENT OF FACTS**

4. STA is the owner of 433 East 76th Street, New York, New York (a/k/a 434 East 77th Street, New York, New York), a parking garage that runs the width of the block from East 76th Street to East 77th Street (the "Garage").

5. STA has been the owner of the Garage continuously since 1975. STA is also the owner and operator of the parking garage business located within the Garage. The business has operated at this location since at least 1975 and has the entire time consisted mainly of parking space rentals offered to the general public.

6. I have been a shareholder of STA since it purchased the Garage in 1975 and have been the president and sole shareholder for more than 20 years. At all times, I have managed the Garage and have had personal knowledge of STA's books and records. I also have close ties to many other garage owners in the City and am familiar with their businesses.

**Contract Cost Overruns ($326,089.00)**

7. On October 25, 2004, STA entered into a contract (the "Contract") with defendant King Sha Group Inc. ("King Sha"), for King Sha to be paid $457,000.00 to expand the Garage by creating a subbasement six feet below the existing basement (the "Project") (a copy of the Contract is annexed hereto as exhibit "F"). The Contract required, among other things, King Sha to excavate and underpin the Garage and all neighboring structures.

8. While the Contract amount included all known work, it was not known how much underpinning of the neighboring structures would be required until the excavation commenced. To resolve this issue, the cost of underpinning to the neighboring structures was

explicitly excluded from the lump sum price in the Contract and added as an extra to the price in the amount of $675 per cubic yard.

9. The Contract did not contain a written schedule or completion date.

10. King Sha subcontracted the excavation and underpinning portion of the Contract to Golden Vale pursuant to a written agreement executed October 27, 2004 (the "Underpinning Subcontract") (a copy of the Underpinning Subcontract is annexed hereto as exhibit "G").

11. Golden Vale commenced work on the Project in or about the first week of November, 2004.

12. On or about March 8, 2005, STA issued a change order to King Sha deleting certain items from King Sha's scope of work and adding others, thereby increasing the Contract to $463,000. (annexed hereto as exhibit "H" is a copy of the handwritten change order).

13. On or about March 14, 2005, King Sha subcontracted the steel portion of the Contract (the "Steel Subcontract") to S&S Decorative Corp. ("S&S") (a copy of the Steel Subcontract is annexed hereto as exhibit "I").

14. On or about March 14, 2005, the Project was stopped by the New York City Department of Buildings (the "DOB") due to alleged damage and settlement discovered in plaintiffs insured's building located at 430 East 77th Street, New York, New York ("430").

15. Plaintiffs retained Mueser Rutledge Consulting Engineers ("MRCE") to determine the cause of the cracking and settling at 430. MRCE issued a geotechnical forensic investigation report dated June 16, 2005 wherein it concluded that the underpinning installed by

Golden Vale on the 430 side of the Project was defective requiring replacement (a copy of MRCE's report is annexed hereto as exhibit "J").

16. In order for STA to continue work on the Project, the DOB required that Golden Vale's defective underpinning first be removed and replaced.

17. Notwithstanding STA's requests, King Sha, Golden Vale and S&S refused to return to the Project. The Contract, the Subcontract and the Steel Subcontract were all incomplete. By that juncture, STA paid a combined total of $370,500.00 to King Sha, Golden Vale and S&S for their work on the Contract.[1] The payments made by STA to Golden Vale and S&S were made at the direction of King Sha in lieu of payments owed by STA to King Sha. Copies of STA's payment detail, payment records and cancelled checks for the foregoing payments are annexed hereto as exhibit "K".

18. At times Golden Vale requested to be paid in cash. Of the payments made by STA to Golden Vale, STA made seven payments in cash for a combined total of $105,000.00. I kept handwritten records of the cash payments and had Golden Vale's project manager, Joseph Doolan, initial on my records to confirm his receipt of the payments. These records are also annexed with exhibit "K".

19. On October 27, 2005, STA entered into a contract with Coffey Contracting Inc. ("Coffey") for Coffey to remove and replace Golden Vale's defective underpinning (the "Remediation Contract", exhibit "L"). STA paid Coffey $90,039.00 to complete the Remediation Contract.[2]

---

[1] $205,000.00 to King Sha, $150,000.00 to Golden Vale and $15,500.00 to S&S.
[2] The Remediation Contract actually cost in excess of $200,000, however, the insurance carriers for CTL and King Sha also made payments to Coffey for the work. STA seeks herein only the monies it paid out of pocket to Coffey on the Remediation Contract and is not seeking any amounts paid by the other parties.

20. Coffey completed the Remediation Contract in or about the first week of March 2006.

21. During the work stoppage, the DOB ordered STA to retain Vibranalysis to monitor movement in the neighboring buildings. Vibranalysis' services cost an additional $13,615.00 which was paid by STA (see the cancelled checks, exhibit "K").

22. STA entered into a second contract with Coffey to complete the original Contract for the amount of $298,750.00 dated April 2006 (the "Completion Contract", exhibit "M").

23. The Completion Contract did not include the costs of steel fabrication and installation and on July 18, 2006, STA entered into a contract with MNS Construction & Renovation for that purpose for the amount of $85,000.00 (the "Steel Completion Contract", exhibit "N").

24. As a direct result of problems caused by Golden Vale and as a condition to proceed with the Project, the DOB issued more stringent requirements for the Project thereby causing the Project to progress much slower than before the work stoppage.

25. Coffey substantially completed the Completion Contract on March 9, 2007.

26. Ultimately, it cost STA the amount of $857,589.00 to complete King Sha's Contract calculated as follows:

| Payee | Amount |
|---|---|
| King Sha | $205,000.00 |
| Golden Vale | 150,000.00 |
| S&S | 15,500.00 |
| Coffey (remediation) | 90,039.00 |
| Coffey (completion) | 298,750.00 |
| MNS | 85,000.00 |

5

        Vibranalysis           <u>13,300.00</u>

                          $857,589.00

27. Had the Contract been completed pursuant to its terms, the Contract would have cost STA the amount of $531,500.00 calculated as follows:

| <u>Item</u> | <u>Amount</u> |
|---|---|
| Lump Sum (after change order) | $463,000.00 |
| Underpinning Extra | <u>68,500.00</u>[3] |
| | $531,500.00 (see the Beach Affidavit, par. 4) |

28. Accordingly, STA incurred the amount of $326,089.00 ($857,589.00 less $531,500.00) in Contract cost overruns as a direct result of Golden Vale's negligence.

**Lost Revenue From Delays ($1,156,604.00)**

29. Even though there was no schedule or completion date in the Contract, the Contract reasonably would have been completed by April 25, 2005, had it not been for the defective underpinning, resulting remedial work and increased DOB oversight (see the Beach Affidavit, par. 5). Instead the Contract took 28 months to complete and was therefore delayed 22 months.

30. STA lost revenue in the amount of $52,572.92 for each month the Project was delayed. STA has determined this amount based upon a formula.

31. Prior to construction, STA had 90 usable legal parking spaces (see STA's permit, exhibit "O"). The goal of the Project was to increase the Garage's legal capacity to 150 cars.

---

[3] The records maintained by King Sha, Golden Vale and Coffey on the Project were poor and many records were missing when King Sha and Golden Vale abandoned the job. As such, the amount that the underpinning extra would have cost STA had the Contract been completed as agreed had to be determined by STA's expert, James R. Beach, P.E. (see the accompanying affidavit of James R. Beach, P.E., hereinafter the "Beach Affidavit").

32. STA's monthly loss calculation is based upon the fact that while the construction was ongoing, STA had use of, at most, 45 parking spots and that, upon completion of the Project and thus the expansion of the Garage, STA would have use of 150 parking spots, a difference of 105 parking spots. So for the delay period of 22 months, STA was without the use of 105 spots. A detailed computation of STA's monthly loss is annexed as exhibit "P".

33. STA's computation is mostly based upon the rates STA charges for its spaces with an expectation of full daily occupancy.

34. STA is required by the City to file a schedule of its parking rates. This was filed on June 21, 2001 (see exhibit "Q") and STA's rates remained consistent with the schedule for the entire delay period.

35. The monthly loss calculation takes into consideration two factors (i) STA's monthly revenue derived from flat monthly rentals which is a constant number and (ii) the average monthly revenue derived from daily rentals, a number which fluctuates (also known as transit rentals).

36. In determining the monthly rentals, STA took the lowest permitted monthly rate per car ($385.00) and multiplied it by 105 for a total amount of $40,425.00. It is important to note that STA's monthly rates are greater when an automobile is an SUV or luxury car. When STA performed its loss calculation, in order to simplify the equation as much as possible, STA conservatively utilized the lowest rate for all available spaces even though a large percentage of the vehicles parked at the Garage are SUV's or luxury cars.

37. Transit rentals differ daily since they are "walk-ins". In determining the monthly transit rental loss, STA first determined its average monthly transit rental income for the 45 available spaces during the construction to be $5,208.25 (annexed hereto as exhibit "R" are

copies of STA's quarterly tax returns for the period of December 1, 2005 through November 30, 2006).  STA then divided the monthly average by 45 to get a monthly average per space of $115.69.  To complete the calculation, STA then multiplied $115.69 by 105 (the amount of spaces STA would have had if the construction had been timely completed) for a monthly loss of $12,147.92.  It then added transit loss average to the monthly rental loss for a total of $52,572.92 monthly of lost revenue (see exhibit "P").  Multiplied by the delay period of 22 months, STA's total lost revenue claim is $1,156,604.00.

38. In understanding this calculation, it is important to note that the garage runs at a 100% occupancy rate on an almost daily basis.  There is a severe shortage of parking on the Upper East Side since there has been a boom of residential construction in the area in recent years combined with tough parking regulations imposed by the City.

39. It is also important to note that the daily transit rental income is possible notwithstanding full occupancy on the monthly rentals because a good percentage of the monthly rentals take their automobiles out of the Garage during the day for work, vacations, etc.  The transit rentals fill the monthly rental spots when the monthly rentals are out.  Therefore, STA often receives two rents for the same spot.

40. I have operated the Garage for the past 30 years in the same location and the lost revenue calculation provided herein is accurate, reasonable (even conservative) and wholly consistent with the Garage's previous performance (see STA's 2002, 2003 and 2004 tax returns for comparison, annexed hereto as exhibit "S").

**Prejudgment Interest ($253,775.00)**

41. STA's counsel advises me that STA is entitled to statutory prejudgment interest on its claim at the rate of 9% from the date the damages were incurred.

42. In determining the prejudgment interest due on STA's cost overruns, STA utilized March 9, 2007, the date of substantial completion of the work, as the accrual date. For the lost revenue, STA's claim began accruing on April 26, 2005, the day after the Contract should have been completed. However, the entire claim did not accrue from that date since the base claim increased monthly (see exhibit "T" for a detailed calculation of the prejudgment interest).

**WHEREFORE,** it is respectfully requested that the Court issue a judgment against Golden Vale and in favor of STA in the amount of $1,736,468.00 and for such other and further relief as deemed necessary and proper given the circumstances.

/S/ Michael Zacharias
Michael Zacharias

Sworn to before me this
15th day of May, 2008

/S/ Russell M. Wolfson
Notary Public